**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **YASSER ALSHARQI, D.O.,**<br><br>*Plaintiff,*<br><br>v.<br><br>**MAIN LINE HEALTH, INC.; MAIN LINE HOSPITALS, INC., d/b/a MAIN LINE HEALTH CARE; and CHRISTINE BLACK LANGENEAU, D.O.,**<br><br>*Defendants.* | **Case No. 2:24-cv-03299-JDW** |

## <u>MEMORANDUM</u>

Employers can terminate employees for a host of reasons, including performance and interpersonal problems at the office. Sometimes, an employer's decision might seem harsh, or even unfair. But it doesn't cross the line to illegal unless the fired employee can show that the employer acted based on some impermissible basis like the employee's national origin or disability. Yasser Alsharqi posits that when Main Line Health, Inc. and Main Line Hospitals, Inc. (together, "Main Line Health") terminated his residency, it acted on those impermissible bases. But he lacks the evidence to back up those serious allegations. Instead, the record demonstrates that Main Line Health terminated him based on concerns about his performance and his interpersonal interactions with his fellow residents. It was allowed to do that, so I will therefore grant summary judgment in this case.

# I.    BACKGROUND

## A.    Factual History

### 1.    Dr. Alsharqi's employment with Main Line Health

Dr. Alsharqi, a physician who practiced for a little over a year as a general practitioner in his home country of Iraq, began his residency with Main Line Health's Bryn Mawr Family Medicine Program in July 2021. The program is structured around four-week clinical rotations across specialties such as OB/GYN and inpatient medicine. Residents train under the supervision of faculty and attending physicians and must complete a rotation before advancing to the next. Dr. Christine Black Langenau, D.O., the Program Director, hired and matched Dr. Alsharqi to Main Line Health and remained his director throughout his training.

For his PGY-1,[1] Dr. Alsharqi and Main Line Health[2] entered into a Resident/Fellow Contract FY 2021-2022. The contract required Dr. Asharqi "[t]o observe and abide by the policies and procedures, rules and regulations of the Hospital, the Medical Staff of the Hospital and of the Training Program" and to "fully participate in evaluations as may be required to ensure fitness for duty and resident well-being". (*Id.* at § 2.) Main Line Health, in turn, had to provide "appropriate, formative, and summative" feedback and allow

---

[1] "PGY" is shorthand for "postgraduate year." The parties sometimes use the phrase "PGY-1 year," but that is redundant.

[2] The contract was between Dr. Alsharqi and Main Line Hospitals. But Defendants haven't made an argument about the corporate distinction between Main Line Health and Main Line Hospitals, so I will refer to them collectively.

residents to dispute inaccurate information in their evaluations. (*Id.* at § 4.) Main Line Health also had to "provide a plan of remediation" for identified performance weaknesses (for example in the form of Academic Performance Workplans) and to "provide an environment that supports educational achievement, acceptable performance and physical, mental and emotional wellness, without undue fatigue and burdensome clinical responsibilities". (*Id.*)

The contract has several provisions that address discipline, renewal, and termination. Section 1 of that agreement required that Main Line Health notify a resident at least four months before the end of the agreement if Main Line Health elected not to renew the resident's contract based on recommendations of the Program Director and the approval of the Graduate Medical Education Committee. If the reasons for nonrenewal arose within the four months prior to the end of the contract, then Main Line Health had to provide as much written notice as circumstances reasonably allowed. The contract recognized that some circumstances, such as a violation of Main Line Health's policies, might require discipline, including warnings, suspension, or termination of a resident's appointment. In addition, Section 9 provided that Main Line Health would address any complaints by or against a resident involving claims of harassment, discrimination, or exploitation under Main Line Health's policy and procedure on Discrimination, Harassment (including Sexual Harassment), and Retaliation Reporting and Resolution, which was incorporated into the contract.

Main Line Health assigned Dr. Bryan Botti as a faculty advisor for Dr. Alsharqi. Dr. Alsharqi later asked Dr. Black about switching advisors, and she suggested Dr. Winson George as a resource for his interest in the osteopathic tract. Throughout his residency, Dr. Alsharqi met with Dr. Black for scheduled feedback and evaluations. He also had several meetings with Drs. Botti and Black regarding his progress in the program.

### 2.    Initial interactions with Drs. Black and Kurtz

According to Dr. Alsharqi, tensions surfaced quickly. Within his first six months, interactions with Dr. Black made him feel uncomfortable. For example, when he suggested that feedback should be handled differently, drawing on his own prior experiences as a director in Iraq, she replied, "Well, you're not the director anymore." (ECF No. 18-4 at 120:7-12, 379:24-380:12.) When he raised complaints from residents about long hours during the pediatric rotation, she responded, "You're just a resident; administration will handle this." (*Id.* at 122:9-124:1, 379:24-380:12.) And in a conversation comparing health systems, specifically where he practiced before and where he was practicing now, Dr. Black noted that the differences might stem from differences in Dr. Alsharqi's cultural background and said, "What works in your culture might not work here." (*Id.* at 124:17-125:2, 379:24-380:12.) The record shows that Dr. Black never made disparaging comments to Dr. Alsharqi about being Iraqi. (*Id.* at 206:7-9.) After six months of residency, Dr. Alsharqi alleges that Dr. Black began scrutinizing his work more closely and encouraged other attending physicians to do the same. (*Id.* at 166:18-167:5.)

Dr. Alsharqi also found some comments from Dr. Flora Kurtz, his internal medicine attending, troubling and biased. During his first month, he recalls that Dr. Kurtz commented on his accent and told him that he "might not make it through here." (*Id.* at 381:9-14, 384:22-385:2.)

### 3.    Performance and conduct concerns

#### a.    First APIW

On February 8, 2022, Dr. Alsharqi received an Academic Performance Improvement Workplan ("APIW") after raising his voice at a medical assistant, an action he admitted. (ECF No. 18-20.) The APIW noted that Dr. Alsharqi's failed to try taking the ABFM ITE exams, which Main Line Health considered unprofessional behavior. Although he explained that he felt insulted by the medical assistant, he did not submit written comments or grieve the APIW. During a discussion with Dr. Black about the APIW, he told Dr. Black that he had chronic medical conditions, though he did not specify what they were. In his deposition, Dr. Alsharqi testified that Dr. Black also asked him about the medical conditions that were making his performance decline. The APIW required him to meet weekly or biweekly with Drs. Botti and Black.

#### b.    Second APIW

Dr. Alsharqi's evaluations during his residency reflected a mix of positive and negative feedback. While he recalls mostly receiving positive comments from some preceptors, his written evaluations tell a more nuanced story. Several supervising physicians, including Dr. Margarita Sergonis (pediatrics rotation) and Dr. Kurtz, identified

5

deficiencies in areas such as his medical knowledge and communications with patients and colleagues. His core-competency evaluations further highlighted concerns with his knowledge, systems practice, and interpersonal skills. Dr. Sergonis even considered failing him in pediatrics but ultimately passed him after discussing the matter with Dr. Black, who flagged that Dr. Sergonis had not given Dr. Alsharqi prior notice of her concerns. Dr. Kurtz rated his performance in his last rotation of his PGY-1 year as "unacceptable" and failed him, citing his limited knowledge for his level.

That failure led to a second APIW, which Drs. Black and George delivered on June 2, 2022. (ECF No. 18-22.) At that meeting, Dr. Alsharqi disclosed for the first time to Dr. Black that he suffered from anxiety, depression, and PTSD. Prior to June 2022, Dr. Alsharqi had not disclosed his specific chronic medical conditions to anyone at Main Line Health. In response, Dr. Black offered him resources through the Employment Assistance Program and stress management support for residents. At some point after Dr. Alsharqi disclosed his medical conditions, Dr. Black asked him if he wanted to see a specialist at Main Line Health. He does not know whether Dr. Kurtz ever learned about his medical conditions. Dr. Alsharqi did not write any comments or grieve the second APIW, which he signed on July 15, 2022, about a year after starting the program.

### c.    Leave of absence and return

On August 16, 2022, Dr. Alsharqi met with Drs. George and Botti and indicated that his medical conditions had worsened. He requested a leave of absence. During that meeting, he complained that Dr. Black had treated him different from other residents

based on his national origin and because he has chronic medical conditions. The record doesn't show that Dr. Black ever learned of this complaint. The following day, Dr. Alsharqi took a leave of absence, which Main Line Health granted.

In addition to his complaint to Drs. George and Botti, at some point during his first year of the residency, Dr. Alsharqi told Drs. William Petricone and Green Chung that Dr. Black treated him differently after disclosing his chronic medical conditions. A few months before June 2023, Dr. Alsharqi also told Dr. Dalea Al-Hawarri that Dr. Black treated him differently because of his chronic medical conditions. Again, the record doesn't show that Dr. Black ever learned of this complaint.

After his leave, Dr. Alsharqi's treating psychologist, Dr. Elliott Rotman, sent Main Line Health a letter stating that Dr. Alsharqi could return to his rotations in October 2022, and asking that he be assigned to a less rigorous and intense rotation than internal medicine. Main Line Health approved that placement. When Dr. Alsharqi returned, Main Line Health placed him in the Bryn Mawr clinic, which Dr. Alsharqi acknowledges was less rigorous than the internal medicine rotation. Main Line Health also extended the deadline for when Dr. Asharqi had to complete the COMLEX exams.

On December 29, 2022, Main Line Health promoted Dr. Alsharqi to a PGY-2 resident. Main Line Health and Dr. Alsharqi entered into a new residency contract for the 2022-2023 academic year. The PGY-2 contract contained identical provisions to the PGY-1 contract regarding, among other things, reappointment, termination, the grievance

proceedings, receiving feedback on his performance, and his expected behavior as a resident. (ECF No. 18-25.)

### d.    Third APIW

At least as early as October 2021, and maybe earlier, Dr. Alsharqi started communicating with his co-resident Dr. Rachel Sternberg. They exchanged text messages, both work-related and personal. Dr. Sternberg repeatedly asked Dr. Alsharqi to stop contacting her after the exchanges started. But the contact did not stop. During a monthly meeting for residents to discuss events outside of the residency, Dr. Alsharqi learned that Dr. Sternberg had been in a car accident. He sent her a message expressing regret that he had been the last to find out and that he had not been able to help her.

Dr. Sternberg screenshotted and sent this message to Dr. Black, requesting that Dr. Alsharqi cease contact. During these discussions, Dr. Sternberg told Dr. Black that Dr. Alsharqi had asked her out. In response, Dr. Black reported Dr. Sternberg's complaints to Human Resources, noting "unwanted contact" and "unwanted life advice" from Dr. Alsharqi. Dr. Black testified that Dr. Sternberg's complaint did not allege sexual harassment, only unwanted contact.

Around the same time, Dr. Black received a complaint from another resident, Dr. Sean Rogers, who said that Dr. Alsharqi was giving him unwanted advice to spend time away from Dr. Sternberg. Dr. Alsharqi denied this, claiming he was only "trying to help the residents get along better." (*Id.* at 92:9-14, 93:11-20, 94:10-22.) Dr. Rogers also reported that Dr. Alsharqi told him, "You have to listen to me, I'm older than you and I'm bigger

than you, you have to listen to me." (*Id.* at 96:20-24.) The record indicates that Dr. Rogers had some personal interest in Dr. Sternberg.

Following these incidents, Dr. Alsharqi received his third APIW in March 2023. (ECF No. 18-29.) It detailed issues of professionalism and interpersonal communication arising from his interactions with Drs. Sternberg and Rogers. It required him to limit contact with them to patient care handoffs. The APIW also referenced an incident in which Dr. Alsharqi objectified another resident after overhearing her speak Spanish with a patient.

In addition, the APIW identified concerns with Dr. Alsharqi's medical knowledge and his openness to feedback. Attendings and preceptors noted problems with the quality of his presentations and observed that he did not accept constructive feedback. (*Id.*) Dr. Alsharqi made a comment on this APIW, acknowledging "poor choices" and "miscommunication" with colleagues but denied bullying anyone. (*Id.* at 11.) He wrote that his intent had been to improve teamwork, and stated he would "accept the PIP in an effort to moving [sic] forward with the residency program." (*Id.*)  Although Dr. Alsharqi inquired about grieving this APIW, he decided against it, and signed it on March 7, 2023.

### e.    Fourth APIW

Following his third APIW, Dr. Alsharqi interacted with Dr. Rogers after *finishing* patient handoffs. Dr. Alsharqi told Dr. Rogers he would report Dr. Rogers for assisting Dr. Sternberg with notes. Main Line Health's policy permits residents to write notes for other residents so as long as they sign their own name. Dr. Alsharqi maintained that he was acting to prevent any errors in patient care and did not understand how he was supposed

to work with his colleagues if he could not talk to two of the residents during the workday. Main Line Health disagreed, finding that he violated his third APIW.

In June 2023, Dr. Alsharqi received his fourth APIW, which he refused to sign. (ECF No. 18-30.) The APIW cited ongoing professionalism concerns and noted that "[d]espite being told to avoid specific residents other than to complete care hand-offs, due to ongoing complaints of harassment, intimidation, and unwanted attention, Dr. Alsharqi approached one of the residency classmates discussed in PIP #3 and threatened to report him for helping the other resident discussed in PIP #3 with notes or coverage." (*Id.* at 2.) The APIW also cited issues with Dr. Alsharqi's performance as it relates to patient care, reception to constructive feedback, and interpersonal communication with patients.

### 4.    Termination and grievance hearings

After receiving his fourth APIW, Dr. Alsharqi alleges that rumors began circulating among his co-residents that he was sexually harassing colleagues. During a virtual resident meeting, he made a point to address these rumors. Though he does not recall his exact words, the gist of his remarks was that he did not appreciate negative comments being made about him and that, if the comments continued, they would amount to defamation. (ECF No. 18-4 at 291:9-19, 294:2-24, 295:21-296:7.) Main Line Health interviewed eight residents regarding the incident, and several residents who attended the meeting reported that they perceived his comments as threatening. For example, one resident stated that Dr. Alsharqi's comments were "uncomfortable" and "very odd and

[the residents] took it as a threat." (ECF No. 18-31 at 2.) Human Resources never contacted Dr. Alsharqi during this process, and he is not aware of the details of the investigation.

On June 20, 2023, one day after the incident, Dr. Black decided to terminate Dr. Alsharqi from the residency program, and Main Line Health did so. (ECF No. 18-5 at 116:8-9.) He learned of the decision in a meeting with Human Resources and Drs. George and Black, where he was handed a termination letter. The letter stated: "We are writing to inform you as [sic] this meeting on June 20, 2023, you are terminated from your job as a resident in Family Medicine in Main Line Health due to violation of your resident contract and failure to satisfactorily complete your Academic Performance Workplans." (ECF No. 18-7.)

Following his termination, Main Line Health held two formal grievance meetings, during which Dr. Alsharqi presented evidence. Dr. Joseph Castelli, a faculty preceptor who had supervised Dr. Alsharqi on one or two rotations in his PGY-1 year, assisted him during the hearings. According to Drs. Castelli and Alsharqi, Dr. Black did not raise any conduct concerns on the first day of the grievance hearing. Instead, she spent the day testifying that she removed Dr. Alsharqi because of his sub-par performance and clinical ability. Dr. Castelli testified in his deposition that after Dr. Black testified and Dr. Alsharqi responded with his own testimony, some department members questioned Dr. Black's explanation, observing that Dr. Alsharqi had received good reviews from some attendings. He also testified that he saw an inconsistency between Dr. Black's testimony in the grievance hearings and the documentation in Dr. Alsharqi's record.

During the second grievance meeting, Dr. Black shifted to discussing Dr. Alsharqi's conduct and behavior in the residency program. In his deposition, Dr. Castelli testified that this was the first time he heard of any allegations of inappropriate conduct by Dr. Alsharqi, and no one had informed him of such concerns. Dr. Castelli had supervised Dr. Alsharqi's for only one or two rotations and had no insight into his performance in his other rotations. (*Id.* at 45:15 – 46:4, 47:17-22, 65:19-24.)

After the grievance hearings concluded, Main Line Health upheld Dr. Alsharqi's termination.

### B.    Procedural History

On October 24, 2024, Dr. Alsharqi filed suit against Main Line Health and Dr. Black, alleging that Main Line Health terminated his residency contract in violation of numerous anti-discrimination statutes including the Americans with Disabilities Act ("ADA"), Title VII of the Civil Rights Act of 1964, Section 1981 of the Civil Rights Act of 1866, and the Pennsylvania Human Relations Act ("PHRA"). Dr. Alsharqi also alleges that Main Line Health breached his residency contract.  Main Line Health and Dr. Black have moved for summary judgment on all of Dr. Alsharqi's claims, and that motion is ripe for disposition.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) permits a party to seek, and a court to enter, summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In ruling on a summary judgment motion, a court must "view the facts and draw

12

reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007) (quotation omitted).

In opposing summary judgment, "[t]he non-moving party may not merely deny the allegations in the moving party's pleadings" and "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* (quotation omitted). "[I]nstead, he must show where in the record there exists a genuine dispute over a material fact." *Doe v. Abington Friends Sch.*, 480 F.3d 252, 256 (3d Cir. 2007) (citation omitted). If he fails to make this showing, then the Court may "consider the fact undisputed for purposes of the motion" and/or "grant summary judgment if the motion and supporting materials — including the facts considered undisputed — show that the movant is entitled to it[.]" Fed. R. Civ. P. 56(e)(2), (3).

## III. ANALYSIS

### A. Employment Discrimination And Retaliation

The familiar *McDonnell Douglas* framework applies to each of Dr. Alsharqi's claims for disparate treatment and retaliation under Title VII, Section 1981, the ADA, and the PHRA.[3] To prevail on any of his claims, he must first establish a *prima facie* case. *See Canada v. Samuel Grossi & Sons, Inc.*, 49 F.4th 340, 346 (3d Cir. 2022). If he makes that showing, then the burden shifts to Main Line Health to articulate a legitimate, non-

---

[3] The same standards apply to the federal claims and the PHRA claims. *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 791 n.8 (3d Cir. 2016); *Berardelli v. Allied Servs. Inst. of Rehab. Med.*, 900 F.3d 104, 126 (3d Cir. 2018).

retaliatory reason for terminating his employment. *See id.* If Main Line Health meets that burden, the burden shifts back to Dr. Alsharqi to establish that Main Line's "explanation was false, and that [discrimination or] retaliation was the real reason for the adverse employment action[s]." *Id.* (quotation omitted). Because the Parties' arguments regarding whether Main Line has established a legitimate, non-retaliatory reason for Dr. Alsharqi's termination and whether he has shown pretext are largely the same across all claims, I will first address the *prima facie* case for each claim and then analyze the legitimate, non-retaliatory reason and pretext together.

1.    *Prima facie* **case**

a.    **National origin**

To establish a *prima facie* case of disparate treatment discrimination based on national origin, Dr. Alsharqi must prove that (i) he is a member of a protected class; (ii) he is qualified for the position he sought to attain or retain; (iii) he suffered an adverse employment action; and (iv) "the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Qin v. Vertex, Inc.*, 100 F.4th 458, 473 (3d Cir. 2024) (quotation omitted). "To establish a prima facie case at summary judgment, the evidence must be sufficient to convince a reasonable factfinder to find all of the elements of [the] prima facie case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (same). Thus, "[i]f a plaintiff fails to raise a genuine dispute of material fact as to ***any*** of the elements of the prima facie case, [he] has not met [his] initial burden, and summary judgment is properly granted for the defendant." *Id.* (emphasis added).

The Parties do not dispute that Dr. Alsharqi is a member of a protected class, that he was qualified for his residency position, or that the termination of his residency was an adverse action.[4] However, Dr. Alsharqi cannot establish that his termination had anything to do with his national origin. He relies on certain remarks by Drs. Black and Kurtz, but those comments, viewed in context, were about cultural differences and communication issues in residency training and patient care, not animus toward his Iraqi origin. For instance, Dr. Black's remark that "what works in your culture might not work here" came during a discussion comparing U.S. and Iraqi health systems. The record does not indicate that she made derogatory comments about Iraqis or criticized Dr. Alsharqi because of his national origin. She was entitled to comment on differences in the professional environments in the two countries without treading into protected territory.

Likewise, Dr. Kurtz's two remarks regarding Dr. Alsharqi's accent, without more, cannot sustain an inference of national origin discrimination. *Mandalapu v. Temple Univ. Hosp. Inc.*, No. 15-5977, 2018 WL 3328026, at *9 (E.D. Pa. July 5, 2018). References to his "culture" or "accent," even if awkward or insensitive, were stray remarks tied to communication and patient care, not his Iraqi heritage. And while he might have an accent as a result of his national origin, the two are not the same.

---

[4] Defendants argue that the APIWs do not qualify as adverse job actions, but Dr. Alsharqi maeks clear that he is not relying on them as adverse actions, so I do not have to resolve that question.

Although Dr. Alsharqi contends that Drs. Black and Kurtz intended to belittle him or assert authority by way of their comments, that is beside the point. Even if one could perceive their remarks as belittling, the law allows Drs. Black and Kurtz to provide guidance to residents, so long as they do not discriminate. *See Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108 (3d Cir. 1997) Indeed, they could just as easily have directed the same comments at an American-born resident who had trained abroad and was unfamiliar with Main Line Health's hospital procedures or an American resident who grew up in the South and had an accent. In that context, the statements would have nothing to do with national origin. That is exactly the case here. Dr. Alsharqi needs some other evidence linking Drs. Black and Kurtz's remarks to discriminatory intent. He offers none.

While direct evidence is one route, it's not the only path to establish an inference of discrimination. Plaintiffs alleging disparate treatment discrimination can satisfy the last element of the *prima facie* case with evidence that their employer treated similarly-situated persons outside the protected class—*i.e.*, comparators—more favorably. *See Qin*, 100 F.4th at 474. To be proper comparators, these other employees must have been "similarly[ ] situated in all respects." *In re Tribune Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018) (quote omitted). Employees are similarly situated in all respects when they held the same job or responsibilities, shared the same supervisor or had the same decision-maker involved in a decision about their employment, have comparable violation histories, and engaged in "nearly identical" conduct. *Doe v. Apria Healthcare Group, Inc.*,

97 F. Supp.3d 638, 645 (E.D. Pa. 2015) (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 259-61 (5th Cir. 2009)).

Dr. Alsharqi has not identified any comparators. He claims that Dr. Black treated other residents better, but he gives no details about who they were or how they are similarly situated. In his deposition, he recalled one instance where Dr. Black praised another resident, but admitted he did not know the medical history of the patient the resident was treating—a key fact necessary for comparison. These barebone assertions cannot help him meet his burden of establishing an inference of intentional discrimination.

### b. Disability

The ADA bars an employer from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). To establish a *prima facie* case of discrimination under the ADA, a plaintiff must show "(1) he is a disabled person within the meaning of the ADA, (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer, and (3) he has suffered an otherwise adverse employment decision as a result of discrimination." *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000). A person is disabled if "he (a) has a physical or mental impairment that substantially limits one of the major life activities of such individual; (b) has a record of such an impairment; or (c) is regarded as having such an impairment." 42 U.S.C. § 12102(1). "Major life activities" include caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting,

bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working. *Id.* § 12102(2)(A).

The record does not show that Dr. Alsharqi's termination or any actions that Dr. Black took had anything to do with Dr. Alsharqi's disability. Main Line Health granted his request for leave and accommodated his return by placing him into a less demanding rotation upon his return. Dr. Alsharqi points to nothing showing that Dr. Black's questions about his performance were connected to his disability. Nor does Dr. Black's offer to have him meet with a specialist demonstrate discriminatory intent. Even if Dr. Black asked other attendings to monitor his work following her awareness of Dr. Alsharqi's medical conditions, that does not show he was fired as a result of his disability. Dr. Alsharqi has therefore not met his burden under the ADA.

### c.    Retaliation

To make out a *prima facie* case for retaliation, Dr. Alsharqi must show: (i) he engaged in protected employee activity; (ii) he suffered adverse action by the employer; and (iii) there is a causal connection between the employee's activity and the employer's adverse action. *See Fogleman v. Mercy Hosp., Inc.*, 283 F.3d 561, 567-68 (3d Cir. 2002); *Gera v. Cty. of Schuylkill,* 617 F. App'x 144, 147 (3d Cir. 2015) (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997)). The Parties only dispute the third element.

To show a causal connection, a plaintiff must show either an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action or a pattern of antagonism coupled with timing to establish a causal link. *See Lauren W. ex*

*rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). A "pattern of antagonism" is a consistent and continuous pattern of conduct, which can include a constant barrage of written and verbal warnings, as well as disciplinary action. *See Robinson v. Se. Pennsylvania Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 895 (3d Cir. 1993). As part of this analysis, a plaintiff must show that decisionmakers had knowledge of the protected activity at the time of the adverse action. *See Daniels v. Sch. Dist. of Philadelphia*, 776 F.3d 181, 196–97 (3d Cir. 2015).

Dr. Alsharqi offers no such proof.  Nothing in the record suggests that Dr. Black—the decisionmaker responsible for his termination—knew of his complaints to Drs. George, Botti, Petricone, Chung, and Al-Hawarri when she terminated him. He admits as much, arguing instead that there is no testimony affirmatively showing Dr. Black was *unaware* of his complaints.  That argument flips the burden on its head; it is not Main Line Health's burden to prove the decisionmaker's lack of knowledge. Without evidence of Dr. Black's knowledge, her decision to terminate him cannot be retaliatory.

The sequence of events also undermines the causal element. Nearly ten months passed between his complaint to Drs. George and Botti and Main Line Health's decision to terminate him in June 2023. Even assuming his complaint to Dr. Al-Hawarri was his last protected act, some "few" months still passed before his termination. "Although there is no bright line rule as to what constitutes unduly suggestive temporal proximity, a gap of three months between the protected activity and the adverse action, without more, cannot create an inference of causation and defeat summary judgment." *LeBoon v.*

*Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (citations omitted). Dr. Alsharqi's evidence, which shows months passing before his termination, does not establish temporal proximity.

Dr. Alsharqi's attempt to show a pattern of antagonism doesn't fare any better. He points to four things: (i) discriminatory remarks by Drs. Black and Kurtz; (ii) Dr. Black asking other attendings to scrutinize his work; (iii) Dr. Black mischaracterizing complaints against him; and (iv) inconsistencies in the reason for his termination. None is enough to permit a reasonable factfinder to find that the causation element in the *prima facie* case has been met. *First*, there is no evidence that Drs. Black and Kurtz harbored discriminatory animus. *Second*, Dr. Black's request reflects what appears to be standard supervision for a resident with document performance issues, and Dr. Alsharqi does not point to any evidence that this oversight intensified after his complaints. "[T]he mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3rd Cir. 1997). *Third*, the record does not support his claim that Dr. Black mischaracterized complaints against him as sexual. *Fourth*, the record belies Dr. Alsharqi's claim of inconsistency in Dr. Black's grievance testimony. Dr. Black testified in both the grievance hearings and her deposition that Dr. Alsharqi was fired because of his conduct and his violation of his fourth APIW. The fact that she also discussed his performance during the grievance hearings does not transform that explanation into a shifting rationale. And in any event, all of Dr. Alsharqi's

APIWs included some performance-related concerns, so her reference to those issues at the grievance stage is neither surprising nor inconsistent with her stated reason for termination. In the absence of these showings, he cannot prove a *prima facie* case of retaliation. *See Shaner v. Synthes*, 204 F.3d 494, 504–05 (3d Cir. 2000).

### 2.    Legitimate nondiscriminatory reason

At the second step of the *McDonnell Douglas* analysis, Main Line Health has advanced a legitimate, non-discriminatory reason for its decision to terminate Dr. Alsharqi. In less than two years after starting his residency, Main Line Health placed him on four APIWs for repeated violations of his residency contract and persistent concerns about his performance and professionalism. Some of those issues never went away. Main Line Health eventually concluded Dr. Alsharqi's conduct towards his fellow residents in June 2023 violated his fourth APIW and chose to terminate him. This documented record of deficiencies, together with his conduct in June 2023, provides a legitimate, non-discriminatory basis for his termination. The burden thus shifts back to Dr. Alsharqi to prove that Main Line Health's reason for terminating his employment was pretextual.

### 3.    Pretext

Even if Dr. Alsharqi could make out a *prima facie* case for his four claims, he cannot demonstrate pretext. The pretext stage of the analysis is the same for discrimination and retaliation claims. To survive summary judgment, a plaintiff must offer evidence from which a factfinder could reasonably "either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an

invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). To satisfy the first prong of the *Fuentes* test, a plaintiff cannot "simply show that the employer's decision was wrong or mistaken." *Id.* Rather, a plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence' ... and hence infer 'that the employer did not act for the asserted non-discriminatory reasons.'" *Id.* at 765. Pretext is difficult to establish. *See id.*

Viewing the evidence in the light most favorable to Dr. Alsharqi, a reasonable juror could not find any evidence of pretext. Main Line Health's explanation for terminating Dr. Alsharqi has been consistent from the start: Each APIW that Dr. Alsharqi received cited at least professionalism, performance, or interpersonal problems. The third APIW prohibited him from contacting certain co-residents outside of patient care. Yet soon after, he approached one of those residents and threatened to report him, prompting his fourth APIW. And at the June 2023 resident meeting, he told his colleagues that spreading rumors could be defamation, which several residents reasonably perceived as threatening. After a prompt investigation, Main Line Health acted the next day, citing both his repeated failure to comply with the APIWs and his conduct at the meeting. He offers no reason to doubt the truth of Main Line Health's explanation for his termination,

nor does he point to evidence making it likely that discrimination or retaliation were the real motivator.

In trying to establish pretext, Dr. Alsharqi downplays the conduct that his APIWs document and his violation of Main Line Health's policies. He points to the positive feedback he received on certain rotations, suggests that Dr. Black orchestrated a retaliatory scheme, and clings to Dr. Castelli's testimony that she noted inconsistencies between Dr. Black's testimony and the documentation. But positive reviews on some rotations do not erase repeated professionalism concerns that several APIWs documented. And the very incidents he now seeks to minimize are the same ones he signed off on in his APIW and the same facts that drove Main Line's decision to terminate him.

Dr. Alsharqi may insist that his intentions were not malicious and were misunderstood, but that's not the issue. "To discredit the employer's proffered reason, the plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether a discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 331 (3d Cir. 1995). It's not my role to second-guess Main Line Health's judgment or to decide whether his performance issues warranted termination. The only question is whether Dr. Alsharqi has adequately established whether discrimination and retaliation played a role such that Main Line

Health's reason for terminating him are implausible, inconsistent, incoherent or contradictory. He has not.

In the end, Dr. Alsharqi's arguments amount to nothing more than his disagreement with Main Line Health's judgment. *See Fuentes*, 32 F.3d at 765. Aside from his assumptions and subjective beliefs that he was treated with discriminatory animus, he cites to no evidence in the record (nor have I found any) to suggest Dr. Black treated others better despite similar performances. And at this stage of the proceedings, speculation is not enough. *See Jones v. School Dist. of Philadelphia*, 198 F.3d 403, 414 (3d Cir. 1999). Dr. Alsharqi needs some evidence to establish pretext, and he has none. His discrimination and retaliation claims thus fail.

### 4.     Aiding and abetting

The PHRA makes it unlawful for individual managers "to aid, abet, incite, compel or coerce the doing of any act declared by this section to be an unlawful discriminatory practice." 43 P.S. § 955(e). Where an employee has not been subjected to discrimination, his individual liability claim must fail. *See Jeannot v. Philadelphia Hous. Auth.*, 356 F. Supp. 3d 440, 449 (E.D. Pa. Dec. 19, 2018). That makes sense because, in the absence of discrimination, there's nothing to aid or abet. Because Dr. Alsharqi has not established a *prima face* case of discrimination, his individual liability claims also fail.

### B.     Breach Of Contract

To prove a breach of contract, Dr. Alsharqi must prove: (1) the existence of a contract including its essential terms; (2) breach of a duty imposed by the contract; and

(3) resultant damages. *Atchison v. Sears*, 666 F. Supp. 2d 477, 497 (E.D. Pa. 2009) (citing *Walker Co. Inc. v. Excalibur Oil Group, Inc.*, 792 A.2d 1269, 1272 (Pa. Super. 2002)). The fight in this case is about the second element: breach.

Dr. Alsharqi claims that Main Line Health breached his residency contract because it (1) failed to provide him with 4 months' written notice before terminating his contract; (2) failed to provide him an opportunity to participate fully in the evaluations he received; (3) withheld proper feedback and the chance to dispute inaccurate information in evaluations; (4) failed to provide him a remediation plan; (5) failed to provide him with an environment that supported his educational achievement and physical, mental, and emotional wellness; (6) failed to investigate the complaints raised against him; and (7) relied on fabricated allegations in terminating him. He has not pointed to any evidence to sustain these claims. The proper starting point for interpretation of a contract is the plain meaning of the contract. *See Amoco Oil v. Snyder*, 478 A.3d 795, 798 (Pa. 1984). A court should not modify the plain meaning of the words of a contract under the guise of interpretation or give the language a construction in conflict with the accepted meaning of the language used. *See id.*

The Parties agree that the Resident/Fellow Contract FY 2022-2023 governs them. Sections 1 and 8 of that contract resolve any misunderstanding about the manner of Dr. Alsharqi's separation from Main Line Health. The record shows Main Line Health terminated Dr. Alsharqi under Section 8, citing his repeated failure to meet performance

standards and violation of his contract which fell under conduct that may be subject to discipline. Accordingly, the four-month notice provision did not apply.

As for Dr. Alsharqi's remaining allegations, no reasonable juror could find a material breach. The record shows that Main Line Health gave him ample evaluations, feedback, and remediation opportunities. He received APIWs that laid out performance concerns and corrective next steps. Some evaluations include the positive comments on which Dr. Alsharqi relies to show that Main Line Health's reason for his termination was pretextual. Main Line Health also investigated complaints of harassment and ultimately acted on its findings. His claim that Main Line Health based his termination on fabricated charges rests solely on his own testimony, without evidentiary support.

While Dr. Alsharqi is within his right to disagree with Main Line Health's decision to terminate him, disagreement does not amount to breach. The record shows Main Line Health also acted well within its rights under the contract.  His breach of contract claim fails, and Main Line is entitled to summary judgment.

## IV.     CONCLUSION

Dr. Alsharqi has failed to demonstrate existence of the essential elements of his claims for disparate treatment, retaliation, and breach of contract. I will therefore grant the summary judgment motion. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

October 1, 2025